

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 29, 2022

**BY ECF**
Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:   *United States v. David Pagan-Lopez*, S3 21 Cr. 640 (PKC)

Dear Judge Castel:

      The Government respectfully submits this letter in advance of the sentencing of defendant David Pagan-Lopez. For the reasons explained below, the Government respectfully submits that a sentence within the Stipulated Guidelines Range of 188 to 235 months' imprisonment, as set forth in the plea agreement, would be sufficient but not greater than necessary to serve the purposes of sentencing.

**I. Background**

    **A. Factual Background**

      This case arose from a yearlong investigation of narcotics activity in Westchester and the Bronx, that, through extensive investigation, ultimately led law enforcement agents to a trio of kilogram-quantity cocaine suppliers: Pagan-Lopez, co-defendant Rigoberto Ramos, and co-defendant Saul Dorta-Hernandez. The investigation identified these three cocaine suppliers based on wiretap interceptions, physical and video surveillance, location data from cellphones and car trackers, and cocaine seizures, among other law enforcement techniques. Examples of the evidence uncovered in the investigation follow.

      1. <u>Pagan-Lopez, Ramos, and Dorta-Hernandez Exchange Cocaine and Cash</u>

      On or about June 21, 2021, as set forth below, law enforcement agents documented a cocaine transaction involving Ramos (who bought cocaine), Dorta-Hernandez (who received cash from Ramos), and Pagan-Lopez (who handed Ramos the cocaine).

      At approximately 6:26 p.m., pole camera footage captured Ramos, who was driving a white Honda Accord (the "Ramos Honda"), pulling into the driveway of Dorta-Hernandez's residence in Newark, New Jersey. Ramos exited his vehicle and met with Dorta-Hernandez by the garage. Ramos then returned to the Ramos Honda and sat in the driver's seat; shortly thereafter, Dorta-Hernandez walked over to Ramos, who handed Dorta-Hernandez a white bag. Based on the wire

intercepts and surveillance below, it is evident that the white bag that Ramos gave Dorta-Hernandez contained payment for narcotics.

At approximately 6:28 p.m. — *i.e.*, while Ramos was with Dorta-Hernandez at Dorta-Hernandez's residence — Ramos was intercepted, pursuant to a Title III wire, receiving a call from Pagan-Lopez. Based on a draft interpretation and transcript of the conversation, which was in Spanish, the following conversation occurred, in substance and in part:

| | |
|---|---|
| **RAMOS:** | Hello. |
| **PAGAN-LOPEZ**: | Talk to me. |
| **RAMOS**: | Yo mother... I'm right here. I just pulled up to the homie. I was waiting for you to call me, where you at? |
| **PAGAN-LOPEZ**: | Yo, come to the WAWA down here. |
| **RAMOS**: | Damn, you can't meet in the bully [Phonetic] zone? |
| **PAGAN-LOPEZ**: | Yeah I could go over there, I could go over there. |
| **RAMOS**: | Aight, how far.... |
| [Voices Overlap] | |
| **PAGAN-LOPEZ**: | You brought something for me? |
| **RAMOS**: | Of course bro, come on. |
| **PAGAN-LOPEZ**: | Oh my God, aight. I'll be .... are you there right now? |
| **RAMOS**: | Yeah I'm right here, I'm in front of Saul. |

On this call, Ramos told Pagan-Lopez that Ramos had just arrived at Dorta-Hernandez's residence ("I just pulled up to the homie"). Ramos asked to meet Pagan-Lopez at the "bully" location (later identified, as set forth below, as the name of a store), and Pagan-Lopez agreed ("I could go over there"). Pagan-Lopez asked if Ramos brought cash ("You brought something for me?"). Ramos answered in the affirmative ("Of course bro") and told Pagan-Lopez that he was with Dorta-Hernandez ("I'm in front of Saul"). As set forth above, Ramos handed Dorta-Hernandez a white bag, which contained payment for narcotics.

At approximately 6:40 p.m. — *i.e.*, approximately ten minutes later — law enforcement agents observed Ramos, driving the Ramos Honda, pull into the parking lot of Bully Zone Pet Supplies & Pet Grooming, located in Newark, New Jersey. As set forth above, Ramos and Pagan-Lopez had agreed to meet at the "Bully" location in an intercepted call. At approximately 6:55 p.m., Pagan-Lopez, driving a red Toyota Supra (the "Pagan-Lopez Toyota"), parked next to the Ramos Honda. Pagan-Lopez exited the Pagan-Lopez Toyota carrying a brown shopping bag and

entered the front passenger's side of the Ramos Honda.  Approximately two minutes later, Pagan-Lopez left the Ramos Honda empty-handed.

At approximately 7:25 p.m. — *i.e.*, about 30 minutes later — law enforcement agents observed Ramos, driving the Ramos Honda, park in the vicinity of Berkeley Terrace, in Irvington, New Jersey.  At approximately 7:33 p.m., an unknown man ("CC-1") exited a maroon van, walked to the Ramos Honda, and entered the front passenger side of the Ramos Honda.  Approximately three minutes later, CC-1 left the Ramos Honda, carrying what appeared to be the same brown shopping bag that Pagan-Lopez had earlier left with Ramos in the Ramos Honda.  Based on the intercepts and events described above, it is evident that the brown bag contained narcotics and that Pagan-Lopez had engaged in a narcotics transaction.

2. Pagan-Lopez and Ramos Discuss Losing 51 Bricks of Cocaine, Which Had Been Seized By Law Enforcement Days Prior

On or about July 1, 2021, at approximately 4:22 p.m., Ramos placed an intercepted call to Pagan-Lopez.  Based on a draft interpretation and transcript of the conversation, which was in Spanish, the following conversation occurred, in substance and in part:

| | |
|---|---|
| **RAMOS**: | You have one or maybe two for right away? Exchange, exchange? |
| **PAGAN-LOPEZ**: | Things are bad, jerk! Everything went down for us. |
| **RAMOS**: | I know, this guy told me yesterday. |
| **PAGAN-LOPEZ**: | Yes, everything went down, the whole 51, brother. Now we have to wait and see, we have some people, that are going to give us something now, I'm waiting for Saul, to confirm with those people. You know? |
| **RAMOS**: | Yeah! |
| **PAGAN-LOPEZ**: | After that, I can deal with you, brother, but right now I'm tied up, honestly. |
| **RAMOS**: | There is nothing, my men need one, that's give and take. |
| **PAGAN-LOPEZ**: | Yes, talk to Saul. |
| [Voices overlap] | |
| **RAMOS**: | I just need two. He told me that might be one, but I thought he was going to holla at you for that. |
| **PAGAN-LOPEZ**: | No! He hasn't called me yet, you talked to him today or yesterday? |

| | |
|---|---|
| **RAMOS**: | No, I spoke to him a little while ago. He said that he thinks it's one. |
| **PAGAN-LOPEZ**: | Let him call me, and we check after that |
| **RAMOS**: | Alright, that's fine. |
| **PAGAN-LOPEZ**: | Alright. |

On this call, Ramos asked Pagan-Lopez for one or two kilograms of cocaine immediately ("You have one or maybe two for right away?"). Pagan-Lopez replied that it would be difficult to fulfill the request ("Things are bad, jerk!") because that he had just lost 51 kilograms of cocaine ("everything went down, the whole 51"). Notably, Pagan-Lopez stated twice that "everything went down," suggesting that a load of 51 kilograms had sunk. As discussed below, Pagan-Lopez grew up in Puerto Rico and previously engaged in cocaine trafficking in Puerto Rico, and he also discussed importing cocaine from Puerto Rico in other intercepted calls on the wire.

These details — the "whole 51," the Puerto Rico source of supply, the going "down," and the timing of the call — all align with a significant narcotics seizure by law enforcement days prior. Specifically, three days before the above call, on or about June 28, 2021, U.S. patrol vessels interdicted a boat four miles off the coast of Puerto Rico. As the patrol vessels approached the boat, the two-man crew threw four large bundles into the water. The patrol vessels were able to recover the four bundles, which contained exactly 51 bricks of cocaine, each weighing approximately one kilogram.

   3. <u>Ramos Obtains a 9mm Glock for Pagan-Lopez</u>

On or about July 31, 2021, at approximately 3:39 p.m., Ramos was intercepted placing a call to Pagan-Lopez. Based on a draft interpretation and transcript of the conversation, which was in Spanish, the following conversation occurred, in substance and in part:

| | |
|---|---|
| **PAGAN-LOPEZ**: | Yo. |
| **RAMOS**: | Yo, I got the joint for you too bro. |
| **PAGAN-LOPEZ**: | All right, I need the bread I don't need. |
| **RAMOS**: | No, I got the bread but I'm deducting the one joint, you heard? |
| **PAGAN-LOPEZ**: | You got one? |
| **RAMOS**: | I got one yeah, 'cause they just gave it to me brand new out the box. |
| **PAGAN-LOPEZ**: | What did they give you? The 40. |
| **RAMOS**: | A glizzy. |
| **PAGAN-LOPEZ**: | A 9 or 40? |

[Background: Phone rings]

**RAMOS**: Nine.

**PAGAN-LOPEZ**: Okay, you have it where? In your house?

**RAMOS**: Yeah, nah I mean I'm picking right now as we speak brand new out the box with two clips.

On this call, Ramos told Pagan-Lopez that Ramos had money ("bread") for Pagan-Lopez, but was deducting some money ("the one joint") for a Glock ("glizzy"), which was "brand new out the box." Pagan-Lopez asked whether Ramos had obtained a 9mm or a .40 caliber firearm. Ramos responded that it was a 9mm firearm ("Nine"), and that he also had two clips of ammunition ("two clips"). Pagan-Lopez asked if the firearm was in Ramos's house ("In your house?"), and Ramos answered it was ("Yeah").

Upon Ramos's arrest on August 20, 2021, law enforcement recovered a Glock 9mm handgun from Ramos's residence.

4. <u>Pagan-Lopez Discusses Importing Cocaine from Puerto Rico Through an Alternate Supplier</u>

On or about August 1, 2021, at approximately 8:15 a.m., Pagan-Lopez placed an intercepted call to FNU LNU 1220, using a telephone number ending in 1220. Based on a draft interpretation and transcript of the conversation, which was in Spanish, the following conversation occurred, in substance and in part:

**FNU LNU 1220**: You know, you are buying the stuff over this way, right?

**PAGAN-LOPEZ**: The what?

**FNU LNU 1220**: The Cuadritos over this way.

**PAGAN-LOPEZ**: Uh-huh.

**FNU LNU 1220**: The carros.

**PAGAN-LOPEZ**: Yes.

**FNU LNU 1220**: I'm with my friend and he's also from over there, from Santurce [Puerto Rico], one of the big ones. And I'm getting it at a ridiculous number.

**PAGAN-LOPEZ**: Okay.

**FNU LNU 1220**: A very good number and I have... and he too... the same one who gives me the low number also has a way to send it anywhere. He has a machine that cost him 9,000 pesos. He can send it anywhere.

    **PAGAN-LOPEZ**: Okay. But how much is going for over there?

    **FNU LNU 1220**: He gets it very cheap and I'm not going to lie. They give it to him... they give it to him at 16, 17, at that number because the one who brings it over, brings like four hundred, five hundred which come in and they give it to him at 16, 17.

    **PAGAN-LOPEZ**: Okay.

    **FNU LNU 1220**: The only thing you have to pay him for is for that and for shipping it. The people who know him from here and over there, he doesn't want to do much with anyone, he is very cool. He says, "Listen [unintelligible], do you think that [unintelligible]?" I said, let me call this guy [mumbles] and whatever number he gives it to me at, then I can [unintelligible] with someone.

    . . .

    **PAGAN-LOPEZ**: Right, because when [unintelligible] we can pay Rapel [phonetic] [audio glitch] you send it over here and I'll release it at twenty [28] but I have to give one peso to the recipient, understand?

    **FNU LNU 1220**: Yes.

    **PAGAN-LOPEZ**: So that would make it 18. I'll take out 10 pesos, 5 for you and 5 for me and the [stammers] the 18 which are yours. Understand? So if you send me 1 a month you'll make 5 pesos on this end with me, understand?

On this call, FNU LNU 1220 solicited Pagan-Lopez to buy from a new narcotics supplier. FNU LNU 1220 explained that he could obtain narcotics at a "ridiculous" price in "Santurce," which is a neighborhood of San Juan, Puerto Rico. FNU LNU 1220 explained that his supplier charged only $16,000 to $17,000 per kilogram, plus the cost of shipping ("The only thing you have to pay him for is for that and for shipping it."). Pagan-Lopez expressed interest, reasoning that if he charged $28,000 per kilogram, then Pagan-Lopez could keep $5,000 and FNU LNU 1220 could keep $5,000 ("I'll take out 10 pesos, 5 for you and 5 for me").

    5. <u>Pagan-Lopez Tells Ramos to "Break" His Phone After Ramos Received a Call from a Suspected Cooperator</u>

On or about August 12, 2021, at approximately 7:04 p.m., agents conducting surveillance saw Ramos's BMW X5 (the "Ramos BMW") park outside of Dorta-Hernandez's residence in Newark. The agents observed, via a pole camera, Dorta-Hernandez enter the Ramos BMW carrying a blue plastic bag, and then exit carrying the same blue plastic bag. Shortly thereafter, the Ramos BMW drove away. Based on preceding wire intercepts between Ramos and Dorta-Hernandez and the events described below, it is evident that the blue bag contained cocaine.

At approximately 7:37 p.m. — *i.e.*, 30 minutes later — agents conducting surveillance saw Ramos's BMW X5 park in the vicinity of Peshine Avenue, just south of Watson Avenue, in Newark. Another vehicle parked behind the Ramos BMW X5, and a co-conspirator ("CC-2") exited the vehicle and walked towards the passenger side of the Ramos BMW X5. A few moments later, agents saw CC-2 return to CC-2's vehicle with a white plastic object in his right hand.

CC-2 began driving away. Minutes later, agents following CC-2 initiated a traffic stop after witnessing a driving infraction. After initially complying with the car stop, CC-2 abruptly accelerated out of the parking lot where he had been pulled over, made a turn, and crashed into multiple vehicles. At the crash site, just behind CC-2's vehicle, was a white plastic bag containing a brick of cocaine.

The following day, on or about August 13, 2021, at approximately 5:50 p.m., Ramos received an intercepted call from Pagan-Lopez. Based on a draft interpretation and transcript of the conversation, which was in Spanish, the following conversation occurred, in substance and in part:

**RAMOS**: N[---], I bust a move with that n[---] yesterday. I bust a move. Yo, that's the n[---] I went and got the joint from Saul. And I fuckin'... went to go see my man. I dropped my man I gave it t to my man, n[---] and 10-15 minutes after he seen me that happened.

**PAGAN-LOPEZ**: But he good though? Did they grab him?

**RAMOS**: No... my n[---]! The n[---] calls me in morning so my thing is, you go on a chase with the police, right?

**PAGAN-LOPEZ**: Yeah.

**RAMOS**: He tells me. Listen to me... this is what he tells me, he don't know I got this video. Cause we had our other boy get this video for us.

[VOICES OVERLAP]

**PAGAN-LOPEZ**: Right, right.

**RAMOS**: Of the whole situation. So he don't know. So yo, he tells me supposedly that once he saw me, he saw his man, right?

**PAGAN-LOPEZ**: Yeah.

**RAMOS**: He told me he saw his man and then while he was leaving [Aside: I'm coming home. I'm **parked** outside.] And that when he was leaving, he noticed that he was being followed. So he sped off, right? So as he sped off somebody's backing out of their parking space and they hit him in the back so he went into like a 360 spin.

**PAGAN-LOPEZ**: Oh shit.

| | |
|---|---|
| RAMOS: | You heard? Somebody was coming out of their parking space. He was running from cops somebody came out the parking space and he spins out, whatever. Long story short bro, my thing is this; my n[---] and that he supposedly had $60,000 on him and that they took $60,000 from him. My thing is this though; yo, whether you have something on you or you ain't have nothing on you. If you run from the police and they catch you... |
| PAGAN-LOPEZ: | You going to jail. |
| RAMOS: | N[---] you going to jail bro. Whether its for nothing whether you be out... but you going to jail. You not gonna be able to hit me at 8:00 in the morning like everything is all good. |
| PAGAN-LOPEZ: | Uh-hmm |
| RAMOS: | That's what I think. You get what I'm saying? |
| PAGAN-LOPEZ: | Uh-hmm, I know. |
| RAMOS: | You not supposed to be outside, that's one. Two, if you [Aside: Yo, go ahead, I'ma be on the thing...] Two, if you notice... that my man points at the bag on the floor at the end of the video. My man points at the bag. At the end of the floor, right? |
| PAGAN-LOPEZ: | Yeah. |
| UF: | [In background: (Unintelligible).] |
| RAMOS: | [Aside: I am.] bro that bag... that phone [phonetic]... I mean that bag, right? |
| PAGAN-LOPEZ: | Uh-hmm. |
| RAMOS: | You know what, let me... I'ma what's her name... I'm about to go get this other phone switched. I'm switching all my phones. |
| PAGAN-LOPEZ: | Uh-hmm. You, switch up. |
| RAMOS: | Yo that bag, my man points to the bag on the floor. That's the bag that I gave him with the joint, bro. |
| PAGAN-LOPEZ: | Ohh. |
| RAMOS: | That's what I think. So I think they found the joint. That's what I think. Right? |
| PAGAN-LOPEZ: | So he's working for them ? |

| | |
|---|---|
| **RAMOS**: | That's what I think bro. I might be wrong, I might be wrong. |
| **PAGAN-LOPEZ**: | Don't answer his calls. |
| **RAMOS**: | No bro no. But if I'm right. I answered his call this morning so while he's on FaceTime with me, I don't know who could have been around at FaceTime... |
| **PAGAN-LOPEZ**: | [Gasps] |
| **RAMOS**: | You know like… |
| [Voices Overlap] | |
| **PAGAN-LOPEZ**: | Break that phone... and call the other one. |
| [Voices Overlap] | |
| **RAMOS**: | Huh? |
| **PAGAN-LOPEZ**: | Break that phone and call Saul. |

On this call, Ramos told Pagan-Lopez that his buyer ("my man"), CC-2, had a run-in with the police ("that happened") shortly after meeting Ramos the preceding day ("10-15 minutes after he seen me"). Pagan-Lopez asked if CC-2 was arrested ("they grab him?"). Ramos, expressing disbelief ("No… my n[---]!"), responded that CC-2 was not arrested and in fact had called Ramos earlier that day ("calls me in the morning"). Ramos explained that CC-2 was unaware that Ramos evidently had video of the car crash ("he don't know I got this video"), and that CC-2 had told Ramos the car crash happened after CC-2 had already sold the cocaine for $60,000 ("He told me he saw his man ... he supposedly had $60,000 on him"). Ramos assessed that this was improbable because regardless of whether CC-2 had the cocaine or the $60,000, he should have been arrested after he ran from the police ("If you run from the police and they catch you... you going to jail bro"). Ramos also pointed out that the bag of cocaine that Ramos had handed CC-2 ("the bag that I gave him with the joint") was visible in the video ("bag on the floor"), and therefore that the police likely found the cocaine ("I think they found the joint"). Pagan-Lopez asked if CC-2 was working with the police ("he's working for them?"). Ramos answered that it was possible ("That's what I think bro. I might be wrong, I might be wrong."). Pagan-Lopez urged Ramos to destroy his phone ("Break that phone") and to let Dorta-Hernandez know ("call Saul").

Thereafter, Pagan-Lopez and Ramos changed their phone numbers.

6. Seizures at Ramos's Arrest

Ramos was arrested on August 20, 2022, and provided consent to search his vehicles, a Honda and a BMW X5, both parked near his residence. Inside the BMW X5, agents found approximately 5 kilograms of cocaine. Inside the Honda, agents found approximately 100 grams of cocaine. Ramos also provided consent to search his residence. As noted above, inside the residence, within Ramos's bedroom, agents found a Glock 9mm handgun.

### B. Procedural Background

On August 20, 2022, Pagan-Lopez was arrested and charged by complaint.

On October 19, 2021, Ramos and his co-defendants were charged in a two-count indictment. (Dkt. 21). Count One charged Ramos with conspiring to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). Count Two charged Ramos with possessing a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c).

Trial was set for August 8, 2022. After the Government had filed its pretrial submissions, on June 28, 2022, Pagan-Lopez pleaded guilty to Count One pursuant to a plea agreement.

The PSR calculates a Guidelines range of 188 to 235 months' imprisonment, as also stipulated in the plea agreement, and recommends a sentence of 188 months' imprisonment. (PSR at 30). The defendant requests a below-Guidelines sentence of 120 months' imprisonment, the minimum required by statute. (Dkt. 116, at 2).

## II. Discussion

### A. Section 3553(a) and the Guidelines

The Sentencing Guidelines provide strong guidance to sentencing courts after *United States v. Booker*, 543 U.S. 220 (2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 49.

After making that calculation, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;

>   (4) the kinds of sentence and the sentencing range established [in the Guidelines];
>
>   (5) any pertinent policy statement [issued by the Sentencing Commission];
>
>   (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
>   (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States* v. *Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

## B. The Court Should Impose a Guidelines Sentence

For this defendant, a sentence within Stipulated Guidelines Range would be sufficient, but not greater than necessary, to reflect the seriousness of the offense; promote respect for the law; provide just punishment for the offense; and afford adequate deterrence to criminal conduct, as required by 18 U.S.C. § 3553(a).

First, the defendant was a significant cocaine dealer in the New York City area and was at the top of a cocaine conspiracy responsible for conspiring to distribute between 50 and 150 *kilograms* of cocaine. Voluminous intercepted phone calls and other evidence document the defendant's prolific drug dealing, along with his co-defendants and other co-conspirators. In addition, in a recorded call, the defendant discusses with Ramos obtaining a handgun, which was recovered by law enforcement at Ramos's arrest. That conduct alone merits a serious sentence.

The defendant asserts that he "was merely an errand-runner, driving around making deliveries and picking up payments for other people." (Dkt. 116, at 11). In particular, the defendant seeks to put the blame on co-defendant Ramos, asserting that the "outside supplier Mr. Lopez Pagan made deliveries for was only one source among many for Mr. Ramos' narcotics distribution network." (*Id.*). But these assertions are contradicted by the evidence. Pagan Lopez was far more than a courier; he is a longtime drug trafficker who was at the top of the expansive cocaine trafficking conspiracy he pled guilty to in this case, regularly distributing kilogram quantities of cocaine in exchange for tens of thousands of dollars. With respect to Ramos, Pagan-Lopez was *at least* an equally culpable partner. For example, Pagan-Lopez, Ramos, and Dorta-Hernandez all conspired to import over 50 kilograms of cocaine in a single shipment. (*See* Section I(A)(2), *supra*). And Pagan-Lopez is more culpable than Ramos from the viewpoint that he was, as the defendant concedes, one of Ramos's *suppliers*. Simply consider, moreover, the call

described above in Section I(A)(4)—where an individual solicits Pagan-Lope to import and distribute kilograms of cocaine from an additional source of supply in Puerto Rico—and there is no doubt that Pagan-Lopez was anything but an errand boy. Lastly, while a gun (or drugs) was not recovered from Pagan-Lopez at his arrest (unlike Ramos), the most sensible explanation for that, beyond dumb luck, is the fact that Pagan-Lopez had already been alerted of his likely arrest by Ramos; and, in any event, the recorded call described above in Section I(A)(3) establishes that Pagan-Lopez asked Ramos to obtain a gun for him. In short, the characterization of Pagan-Lopez as "an errand boy" strains credibility and is contradicted by the facts of this case.

Second, like several of his co-conspirators, Pagan-Lopez is also a serial violator of the criminal law. Indeed, Pagan-Lopez began trafficking cocaine and carrying firearms, including in connection with drug robberies, as early as the mid-1990s. (*See* Exhibit 1 ("2005 Trial Tr."), at 3714-15).[1] But Pagan-Lopez's criminal history stands apart from his co-defendants. In addition to his conviction for endangering the welfare of a child, in March 2001, Pagan-Lopez committed murder. He murdered Kenneth Allen, a/k/a "Smoochie," for purportedly stealing drugs, by shooting him three times with a firearm. (2005 Trial Tr. 3795, 3803-04). That drug-related murder arose from Pagan-Lopez's participation in a drug trafficking organization in Camden, New Jersey, where he managed more than 50 "trappers" (street sellers) and carried firearms. (2005 Trial Tr. 3725, 3740-41, 3750). After committing the murder, Pagan-Lopez continued working as a manager in the drug trafficking organization. (2005 Trial Tr. 3806). Ultimately, he began cooperating with law enforcement, and testified at the trial of his co-defendants in 2005. (2005 Trial Tr. 3854-55, 3877). Despite his cooperation, the defendant received a twenty-year sentence in that case. He was released from prison in July 2019. And in spite of all that, Pagan-Lopez continued to traffic narcotics upon his release (while on supervised release). Most disturbingly, there is no question that Pagan-Lopez sought to acquire another gun in connection with *this* narcotics conspiracy.

In light of the seriousness of the offense, the need to protect the community, and the clear need to promote respect for the law and deter Pagan-Lopez's continuing criminal conduct, a sentence in the Stipulated Guidelines Range will be sufficient but not greater than necessary to serve the purposes of criminal sentencing.

---

[1] Attached hereto as Exhibit 1 is the transcript from the defendant's 2005 trial testimony in the District of New Jersey, where he testified as a cooperating witness. This testimony was previously described in the Government's motions *in limine*. (Dkt. 71, at 18-19).

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the Stipulated Guidelines Range of 188 to 235 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

by: ___/s/_____
Micah F. Fergenson/Alexander Li
Assistant United States Attorney
(212) 637-2190/2265

Cc: Eric Breslin, Esq. (By ECF)